UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
NATIONAL MINING ASSOCIATION,   )
                               )
          Plaintiff            )
                               )
          v.                   )   Civil Action No. 00-283 (RWR)
                               )
LYNN SCARLETT, et al.,         )
                               )
          Defendants.          )
_____    )
```

<u>MEMORANDUM OPINION</u>

Plaintiff National Mining Association ("NMA") challenges as arbitrary, capricious, or otherwise inconsistent with the law the 1999 final rule of the Office of Surface Mining Reclamation and Enforcement ("OSM") and the Secretary of the Interior ("Secretary")[1] interpreting "valid existing rights" under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "the Act"), 30 U.S.C. §§ 1201 <u>et seq.</u>, which prohibits new surface coal mining operations on specified lands subject to valid existing rights.  NMA alleges that the final rule improperly limits the circumstances under which valid existing rights will be recognized, contrary to clear Congressional intent.  NMA has moved for summary judgment, and the Secretary

---

[1] Lynn Scarlett, the current Acting Secretary of the Interior and Jeffrey Jarrett, the current Director of the Office of Surface Coal Mining and Reclamation, are substituted as defendants in lieu of former Secretary Bruce Babbit and former Director Kathleen Karpan.  <u>See</u> Fed. R. Civ. P. 25(d)(1).

- 2 -

and OSM, and intervenor-defendants, have cross-moved for summary judgment.  Because NMA has failed to show that the 1999 final rule is contrary to the clear intent of Congress, arbitrary, capricious, or otherwise inconsistent with the law, NMA's motion for summary judgment will be denied.  Moreover, because the Secretary's interpretation of valid existing rights is a permissible construction of the statute and the agency reviewed all the relevant data in reaching its conclusion, defendants' and intervenor-defendants' motion for summary judgment will be granted.

BACKGROUND

The SMCRA was passed in 1977 as "a comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'"  Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264, 268 (1981) ("VSMRA") (quoting 30 U.S.C. § 1202(a)).  Congress sought to "strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy."  30 U.S.C. § 1202(f).  Section 522(e) of the Act prohibits new surface coal mining operations on certain lands directly declared by Congress to be unsuitable for mining.[2]  30

_____

    [2] These lands include the National Park System, the National Wildlife Refuge Systems, the National System of Trails, the National Wilderness Preservation System, the Wild and Scenic

- 3 -

U.S.C. § 1272(e)(1)-(5); see also Nat'l Wildlife Fed. v. Hodel,

839 F.2d 694, 749 (D.C. Cir. 1988).  However, the prohibition of

new mining operations on these lands is "subject to valid

existing rights."  Id.  Congress failed to define or elaborate on

the meaning of "valid existing rights" in the statutory language

of the SMCRA or in its legislative history.  See Nat'l Wildlife

Fed. v. Hodel, 839 F.2d at 749.  The meaning of valid existing

rights in the SMCRA has been the subject of extensive litigation

since the passage of the Act, and in 1999, OSM promulgated the

latest iteration of regulations defining the phrase.  See Valid

Existing Rights, 64 Fed. Reg. 70766, 70766-838 (Dec. 17, 1999).

I.   REGULATORY HISTORY

     A.   1979 regulation

     OSM first promulgated a final rule defining valid existing

rights for SMCRA § 522(e) in 1979.  This first final rule

> provided that, except for haul roads, [valid existing
> rights] included only those property rights in
> existence on August 3, 1977, the owners of which either
> had obtained all necessary permits for the proposed
> surface coal mining operation on or before August 3,
> 1977 (the 'all permits' standard), or could demonstrate
> that the coal for which the exception was sought was
> both needed for and immediately adjacent to a surface
> coal mining operation in existence on August 3, 1977
> (the 'needed for and adjacent to' standard).

---

Rivers System, federal lands within any national forest, publicly
owned parks or historic sites that will be adversely affected by
mining, areas within one hundred feet of public roads, areas
within three hundred feet of occupied dwellings or public and
community buildings, and areas within one hundred feet of a
cemetery.  See 30 U.S.C. § 1272(e)(1)-(5).

- 4 -

64 Fed. Reg. at 70769-70 (citing 44 Fed. Reg. 14902, 15342 (Mar. 13, 1979)).  Several plaintiffs challenged the adoption of the "all permits" standard defining valid existing rights, arguing, among other things, that the standard was contrary to Congressional intent to preserve state law property rights, that it constituted an unconstitutional taking, and that it was arbitrary and capricious.  See In re Permanent Surface Mining Regulation Litigation, 14 Env't Rep. Cas. (BNA) 1083, 1090-91 (D.D.C. Feb. 26, 1980) ("PSMRL I").  The district court remanded the regulation back to OSM explaining that the "all permits" standard must also include individuals who had not yet obtained all permits but had made a good-faith attempt to do so.  Id. at 1091.  The PSMRL I court did not reach the question of Congressional intent explaining that the Secretary had conceded that Congress intended valid existing rights "to encompass property rights recognized as valid under state case law."  Id. at 1090.  The court also declined to reach the takings challenge to the "all permits" standard because the plaintiffs' claim was "hypothetical" and did not present the court with sufficient facts to decide the issue.  Id. at 1091.  On appeal, because the government informed the court it was reconsidering the 1979 rule, the D.C. Circuit remanded the case to the district court.  In so doing, the D.C. Circuit explained that the district court judgment should not be considered final and that the issues and

- 5 -

arguments raised should be considered during the planned regulatory revision process.  64 Fed. Reg. at 70770 (citing <u>In re Permanent Surface Mining Regulation Litigation</u>, No. 80-1810, Order of Remand (D.C. Cir. Feb. 1, 1983).  (<u>See</u> Pl.'s Stmt. of Material Facts ¶ 16.)  In 1980, OSM suspended the 1979 final rule and announced that in the interim period the agency would interpret valid existing rights to include a property rights holder who had obtained all permits or had made a good faith effort to obtain all permits.  64 Fed. Reg. at 70770.  (<u>See</u> Pl.'s Stmt. of Material Facts ¶ 17.)  This standard has come to be known as the "good faith/all permits" standard.  <u>Id.</u>

   B.   <u>1983 regulation and 1986 suspension notice</u>

   In 1983, OSM issued a final rule adopting a "takings" standard for valid existing rights.  The rule provided that a valid existing right would exist

>   for an area protected under section 522(e) of the Act
>   on August 3, 1977, if the application of any of the
>   prohibitions contained in that section to the property
>   interest that existed on that date would effect a
>   taking of the person's property which would entitle the
>   person to just compensation under the Fifth and
>   Fourteenth Amendments to the United States
>   Constitution.

(Pl.'s Stmt. of Material Facts ¶ 22) (quoting 30 C.F.R. § 761.5 (1983).)  <u>See</u> 64 Fed. Reg. at 70770.  In settling on this rule, OSM rejected all six rules, including a "good faith/all permits" standard, that it had proposed in 1982.  64 Fed. Reg. at 70770. (<u>See</u> Pl.'s Stmt. of Material Facts ¶ 20.)  Several plaintiffs

- 6 -

challenged the final rule arguing that the rule was so different from the various proposed rules that the agency was required to have an additional period for notice and comment.  In re: Permanent Surface Mining Litigation, 22 Env't Rep. Cas. (BNA) 1557, 1558-59 (D.D.C. Mar. 1, 1985) ("PSMRL II").  The PSMRL II court agreed and remanded the rule to the agency.  Id. at 1559, 1567.  In a 1986 suspension notice, OSM rescinded the rule in order to comply with the court's order and reinstated the "good faith/all permits" standard.  64 Fed. Reg. at 70770.  (See Pl.'s Stmt. of Material Facts ¶ 26.)

    C.   1988 and 1991 rulemaking and the Energy Policy Act of 1992

In 1988, OSM proposed, but later withdrew to allow further study, a rule defining valid existing rights as including the "good faith/all permits" standard and an "ownership and authority" standard under which valid existing rights could be established by demonstrating ownership of the coal and authority to mine it according to applicable state law.  64 Fed. Reg. 70770-71.  (See Pl.'s Stmt. of Material Facts ¶ 27-34.)  In 1990, OSM and the University of Kentucky College of Law cosponsored a symposium on the meaning of valid existing rights in § 522(e) of the SMCRA.  64 Fed. Reg. at 70771.  See generally Symposium on Valid Existing Rights, 5 J. of Min. L. & Pol'y 381 (1990).  "The participants [of the symposium] provided extensive analyses of takings jurisprudence and case law related to [valid existing

- 7 -

rights], but they did not reach a consensus on how to determine [those rights]." 64 Fed. Reg. at 70771. Still seeking to comply with the court's order in PSMRL II, in 1991, OSM proposed to define valid existing rights as including the "takings" standard, the "good faith/all permits" standard, and the "needed for and adjacent to" standard. 64 Fed. Reg. at 70771. (See Pl.'s Stmt. of Material Facts ¶ 40.)

Before OSM promulgated a final rule, Congress enacted and the President signed the Energy Policy Act of 1992, directing the Secretary to interpret valid existing rights as set forth in the 1986 suspension notice that had adopted the "good faith/all permits" standard. See Pub. L. No. 102-486, 206 Stat. 2776 (1992). The Energy Policy Act of 1992 expired on October 23, 1993. However, the "good faith/all permits" standard continued as the regulatory standard for valid existing rights through October 1, 1995 because Congress placed moratoriums on publication of a new final rule on the definition of valid existing rights. See, e.g., Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 103-332, 108 Stat. 2499 (1995); see also 64 Fed. Reg. at 70771.

D.   1999 regulation

In 1997, after evaluating the comments received on the 1991 proposed rule, OSM withdrew the rule and proposed a rule defining valid existing rights with the "good faith/all permits" standard.

- 8 -

See <u>Valid Existing Rights</u>, 42 Fed. Reg. 4836 (Jan. 31, 1997).  In

December 1999, the agency promulgated a final rule by largely

adopting its proposed rule.  Under the rule, a person can

establish valid existing rights by demonstrating a property right

under applicable state law existing at the time the land came

under protection of the SMCRA that vests the person with the

right to conduct the intended type of surface coal mining

intended, and (1) by having acquired or made a good-faith effort

to acquire all necessary permits to conduct mining before the

land came under protection of the act, or (2) demonstrating that

the land is needed for and immediately adjacent to a surface coal

mining operation.  <u>See</u> 30 C.F.R. 761.5.  The rule also recognizes

valid existing rights for use or construction of roads on

protected land under certain circumstances.  <u>Id.</u>

II.  THE RULEMAKING PROCESS FOR THE 1999 FINAL RULE

During the rulemaking process for the 1999 final rule, OSM

considered several alternative definitions of valid existing

rights, weighed the environmental impact of each alternative and

considered the legislative history of SMCRA § 522(e), relevant

litigation and case law, and comment letters before selecting the

"good faith/all permits" and "needed for and adjacent to"

standards.

- 9 -

A.   Alternative regulatory standards

The alternative regulatory standards OSM considered included the "needed for and adjacent to" standard in combination with each of the following standards: (1) a "good faith/all permits" standard, (2) a "good faith/all permits or takings" standard under which valid existing rights could be established by a good faith effort to obtain all necessary permits or if applying the prohibitions of § 522(e) would result in an unconstitutional taking, (3) an "ownership and authority standard" under which a person claiming a valid existing rights exception would be required to demonstrate both a property right to the coal and the right to mine by the method intended, and (4) a "bifurcated" standard, under which either the "ownership and authority" standard or the "good faith/all permits" standard would apply depending on whether and when the mineral rights were severed from the estate.  64 Fed. Reg. at 70775.  OSM concluded that the good faith/all permits and needed for and adjacent to standard[3] "best achieves protection of the lands listed in section 522(e) in a manner consistent with congressional intent at the time of SMCRA's enactment[,]" while simultaneously protecting "the interests of those persons who had taken concrete steps to obtain

---

[3] For brevity, this standard will be referred to as the "good faith/all permits" standard, but encompasses the recognition of valid existing rights in certain circumstances for use or construction of roads.

- 10 -

regulatory approval for surface coal mining operations on lands
listed in section 522(e) before those lands came under the
protection" of the SMCRA.  Id. at 70776.  OSM also determined
that adoption of the "good faith/all permits" standard would
cause the least disruption to the current State regulatory
programs because "20 of the 24 approved State regulatory programs
under SMCRA already rely upon either the good faith/all permits
standard or the all permits standard."  Id.

    B.   Environmental and economic impact

OSM analyzed the environmental and economic impacts of each
of these alternative regulatory standards and found that
"compared with the other alternatives considered, the good
faith/all permits standard is the most protective of the lands
listed in section 522(e)."  Id.  In support of its finding, OSM
cites an environmental impact statement that predicts that the
adoption of the "takings" standard would result in the mining of
2,855 more acres of protected lands between 1995 and 2015 than if
the "good faith/all permits" standard were adopted.  Id.  The
impact statement predicted that the adoption of either the
bifurcated standard or the "ownership and authority" standard
would result in the mining of over 3,000 additional acres
comparatively during the same time period.  Id.  OSM emphasized
that the "additional disturbance would occur entirely on some of
the lands for which the Senate Committee expressed the most

- 11 -

concern." Id.  In analyzing the economic impact of each proposed

rule, OSM found only "negligible differences among the

alternatives in terms of their economic impact." Id.

     C.   Consideration of legislative history

     OSM also considered the legislative history of SMCRA

§ 522(e), but was unable to discern from Congress "clear or

dispositive direction on the meaning or purpose of [valid

existing rights.]" Id.  OSM grants that "[t]here are credible

supporting and opposing arguments for each alternative," but

ultimately credits the Senate and House committee reports on the

bills that eventually became the SMCRA to conclude that

"Congress' purpose in enacting section 522(e) was to prevent new

surface coal mining on the lands listed in that section." Id.

OSM specifically cites the following language from the Senate

Committee on Energy and Natural Resources:

> [T]he Committee has made a judgment that certain lands
> simply should not be subject to new surface coal mining
> operations.  These include primarily and most
> emphatically those lands which cannot be reclaimed
> under the standards of this Act and the following areas
> dedicated by the Congress in trust for the recreation
> and enjoyment of the American people:  lands within the
> National Park System, the National Wildlife Refuge
> System, the National Wilderness Preservation System,
> the Wild and Scenic Rivers System, National Recreation
> Areas, National Forests with certain exceptions, and
> areas which would adversely affect parks or National
> Register of Historic [Places].
>      In addition, for reasons of public health and
> safety, surface coal mining will not be allowed within
> one hundred feet of a public road (except to provide
> access for a haul road), within 300 feet of an occupied

- 12 -

building or within 500 feet of an active underground
mine.

    Since mining has traditionally been accorded
primary consideration as a land use there have been
instances in which the potential for other equally or
more desirable land uses has been destroyed.  The
provisions discussed in this section were specifically
designed and incorporated in the bill in order to
restore more balance to Federal land use decisions
regarding mining.

S. Rep. No. 95-128, at 55 (1977).  OSM also cites the House

Committee on Interior and Insular Affairs report, which reads in

part:

    [T]he decision to bar surface mining in certain
circumstances is better made by Congress itself.  Thus
section 522(e) provides that, subject to valid existing
rights, no surface coal mining operation except those
in existence on the date of enactment, shall be
permitted on lands within the boundaries of units of
certain Federal systems such as the national park
system and national wildlife refuge system[], on
Federal lands within the boundaries of any national
forest (except in those circumstances set forth in Sec.
522(c) of the committee amendment) or in other special
circumstances, that is within 100 feet of public roads,
300 feet of public buildings or churches, or 100 feet
of a cemetery.

H.R. Rep. No. 95-218, at 95 (1977).  OSM also explained that its

definition for valid existing rights differs from the definition

of the phrase in other federal statutes because unlike other

statutes, the SMCRA applied to both Federal and non-Federal

lands, concerns only a person's right to use land for a

particular purpose and does not involve a transfer of property

rights or interests from the Federal government to another party.

64 Fed. Reg. at 70793.

- 13 -

D.   <u>Review of relevant litigation</u>

OSM also reviewed relevant litigation concerning valid
existing rights and potential takings under the SMCRA.  OSM
addressed the statement by the Supreme Court in <u>VSMRA</u>, 452 U.S.
at 296 n.37, that an "all permits" standard for the valid
existing rights exception "is not compelled by either the
statutory language [of the SMCRA] or its legislative history."
OSM reasoned that <u>VSMRA</u> did not reject the possibility of a "good
faith/all permits" standard because the Court chose "decidedly
neutral" language in stating simply that an "all permits" rule
with no good-faith exception was not compelled by SMCRA and
because "the definition of [valid existing rights] was not before
the court" in that case.  64 Fed. Reg. at 70779.  In addition,
OSM explained its reliance on <u>PSMRL I</u> where the court held that
"a good faith attempt to obtain all permits before the August 3,
1977 cut-off date should suffice for meeting the all permits
test" that was promulgated in 1979.  <u>PSMRL I</u>, 14 Env't Rep. Cas.
(BNA) at 1091; <u>see</u> 64 Fed. Reg. at 70779.  OSM also explained
that <u>PSMRL I</u> held only that state law must be taken into account
during the property rights demonstration prong of a permit-based
standard requiring valid conveyance of a property right and
receipt of all permits by the property right owner.  <u>See</u> 64 Fed.
Reg. at 70779.  Further, OSM reviewed the Supreme Court's takings
jurisprudence, and cases that have challenged the

- 14 -

constitutionality of § 522(e) specifically.  Id. at 70780-81.
Based on that review, the agency concluded that "there is nothing
in these court decisions, SMCRA, or its legislative history that
precludes adoption of a good faith/all permits standard for
[valid existing rights] under section 522(e) or suggests that
adoption of this standard would be a facial regulatory taking."
Id. at 70781.

     E.   Consideration of public comments

     Finally, OSM heard testimony in the four public hearings it
held on the proposed rule and considered approximately 75 comment
letters submitted by interested parties during the notice and
comment period.  Id. at 70767.  The comments OSM considered
expressed a wide range of concerns about the "good faith/all
permits" definition of valid existing rights and were submitted
by private citizens, companies and associations affiliated with
mining, environmental groups, and federal, state, and local
governmental entities.  Id. at 70767.

     NMA challenges the 1999 final rule adopting the "good
faith/all permits" standard arguing that the rule is contrary to
clear Congressional intent, arbitrary and capricious, and an
unconstitutional infringement on property rights.  Defendants
counter that Congress did not express a clear intent regarding
how valid existing rights should be defined, and that the 1999

- 15 -

final rule is permissible and reasonable in light of the record,
legislative history and language of the SMCRA.

## DISCUSSION

Summary judgment is appropriate where the record shows that
"there is no genuine issue as to any material fact and . . . the
moving party is entitled to judgment as a matter of law." Fed.
R. Civ. P. 56(c). A party seeking summary judgment must provide
the district court with a factual record sufficient to
demonstrate the absence of a genuine issue of material fact. See
Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002). This action
arises out of a disagreement over the validity of the regulations
that OSM promulgated in 1999, and no genuine issue over material
facts exists.

I.   STANDARD OF REVIEW

Under the SMCRA, a court must invalidate regulations that
are "arbitrary, capricious, or otherwise inconsistent with the
law." 30 U.S.C. § 1276(a)(1). To determine if agency action is
arbitrary and capricious, district courts employ the two-part
test of Chevron U.S.A., Inc. v. Natural Resources Defense
Council, Inc., 467 U.S. 837 (1984). A court must first determine
"[i]f 'Congress has directly spoken to the precise question at
issue[.]'" New York v. EPA, No. 03-1380, 2006 WL 662746, at *2
(D.C. Cir. Mar. 17, 2006) (quoting Chevron, 467 U.S. at 842). If
Congress clearly expressed its intent, then "'that is the end of

the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  Id. (quoting Chevron, 467 U.S. at 842-43).  However, "if the statute is silent or ambiguous . . . [courts] defer to the agency's interpretation, asking 'whether [it] is based on a permissible construction of the statute.'"  Id. (quoting Chevron, 467 U.S. at 843).

    To determine Congressional intent and the meaning of the statute under the first prong of Chevron, courts employ "traditional tools of statutory construction[.]"  See id.; Automated Power Exch., Inc. v. FERC, 204 F.3d 1144, 1151 (D.C. Cir. 2000).  Chevron analysis often begins and ends with the statutory text because "the language of the statute itself is always the best indication of congressional intent."  Abbott Labs. v. Young, 920 F.2d 984, 987 (D.C. Cir. 1990).  In order to determine whether the plain language of the statute is dispositive, the court must consider not only the particular statutory language at issue, but "'the language and design of the statute as a whole'" as well.  Coal Employment Project v. Dole, 889 F.2d 1127, 1131 (D.C. Cir. 1989) (quoting K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)).  However the court is not confined to the four corners of the statute and may also consider the statute's legislative history when determining whether Congress clearly expressed its intent.  Id.

- 17 -

If Congress has not clearly expressed its intent on the precise issue, considerable weight is due an agency's reasonable construction of a statutory scheme it is entrusted to administer. Chevron, 467 U.S. at 843-44. "[J]udicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law." U.S. Postal Serv. v. NLRB, 969 F.2d 1064, 1069 (D.C. Cir. 1992) (quoting Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417 (1992)). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Southern Co. Services, Inc. v. FCC, 313 F.3d 574, 579-80 (D.C. Cir. 2002) (internal quotation marks omitted). A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 580 (internal quotations marks omitted).

II. CONGRESSIONAL INTENT

NMA argues that Congress clearly announced its intent for the definition of valid existing rights and that OSM's 1999 final rule adopting a "good faith/all permits" standard is contrary to that intent. (See Pl.'s Mem. of Points and Auths. in Supp. of Mot. for Summ. J. ("Pl.'s Mem. Summ. J.") at 7-27.) However, the D.C. Circuit already has explained that "[n]either the statutory

- 18 -

language nor the legislative history [of the SMCRA] elaborate on the meaning of the phrase 'valid existing rights.'"   Nat'l Wildlife Fed. v. Hodel, 839 F.2d at 749.  After more than twenty years of litigation, the only guideposts evident for permissible regulations defining valid existing rights are that an all-permits rule with no good-faith exception is arbitrary and capricious, see PSMRL I, 14 Env't Rep. Cas. at 1091, and that Congress intended some recognition of applicable state law property rights and an avoidance of takings.[4]  See Nat'l Wildlife Fed. v. Hodel, 839 F.2d at 750.  OSM has not strayed outside the boundaries of these guideposts because OSM's 1999 final rule includes a good-faith exception, encompasses recognition for state law property rights at the property right demonstration prong of the rule, and reveals concern over minimizing takings. The 1999 final rule is not contrary to Congressional intent.

_____

[4] NMA believes the D.C. Circuit's reference in National Wildlife Federation v. Hodel to the legislative history of the SMCRA as providing "some help" in "suggest[ing] that Congress did not intend to infringe on valid property rights or effect takings through § 522(e)" was a declaration from the court that Congress clearly intended to preclude any permits-based standard for defining valid existing rights.  (See Pl.'s Mem. Summ. J. at 33-34 (discussing Nat'l Wildlife Fed. v. Hodel, 839 F.2d at 750).) However, the court's cautious language counsels against such a broad reading.  Moreover, in that case the D.C. Circuit affirmed a ruling of the district court that a permits-based standard was consistent with the SMCRA.  Nat'l Wildlife Fed. v. Hodel, 839 F.2d at 750-51.

- 19 -

III. PERMISSIBLE CONSTRUCTION

OSM also considered the relevant factors and articulated a satisfactory explanation for its decision, and so the agency's decision is due <u>Chevron</u> deference.  OSM considered four definitions of valid existing rights and analyzed the economic and environmental impact of each alternative.  64 Fed. Reg. at 70775-76.  In addition, OSM examined the legislative history of section 522(e), reviewed the extensive relevant litigation and considered the potential takings implications.  <u>Id.</u> at 70768-69, 70778-81.  OSM also conducted four public hearings, and reviewed approximately seventy-five written comments.  <u>Id.</u> at 70767.

In justifying its decision, OSM primarily explained that the "good faith/all permits" rule is consistent with the underlying purposes of SMCRA and with current state regulatory regimes. When the SMCRA was enacted in 1977, it was designed as a compromise "both to protect the environment and to ensure an adequate supply of coal to meet the nation's energy requirements."  <u>Nat'l Wildlife Fed'n v. Lujan</u>, 950 F.2d 765, 770 (D.C. Cir. 1991) (citing 30 U.S.C. § 1202(f)).  The Senate Committee on Energy and Natural Resources concluded that § 522(e) was specifically designed to "restore more balance to Federal land use decisions regarding mining."  S. Rep. No. 95-128, at 55 (1977).  The "good faith/all permits" standard adopted by OSM reasonably strikes a balance between protecting the environment

and ensuring an adequate supply of coal.  Of the definitions of valid existing rights OSM considered, the "good faith/all permits" definition is "the most protective of the lands listed in section 522(e)."  64 Fed. Reg. at 70776.  An environmental impact study cited by OSM predicted that implementing the "ownership and authority" standard, as opposed to the "good faith/all permits" standard, would open up 3,062 more acres of land to surface coal mining.  Id.  The "good faith/all permits" standard also "protects the interests of those persons who had taken concrete steps to obtain regulatory approval for surface coal mining operations on lands listed in section 522(e) before those lands came under the protection of . . . section 522(e)."  Id.  Additionally, OSM reports that its final rule would have no "significant economic impact on the mining industry or the cost of producing and delivering coal."  Id.

OSM reports, and NMA does not dispute, that the "good faith/all permits" standard is also consistent with current state regulatory standards.  In fact, many state regulatory programs have relied on the "good faith/all permits" standard for approximately twenty years.  (See Federal Defendants' Reply Mem. at 10.)  Prior to the issuance of the 1999 final regulation, twenty state regulatory programs had incorporated some version of the "good faith/all permits" standard or the "all permits" standard into their own regulatory frameworks.  64 Fed. Reg. at

- 21 -

70776.  Further, the "good faith/all permits" rule previously has been applied as the federal standard, having been implemented in 1980 and 1986 at the direction of OSM and in the early 1990s at the direction of Congress.  OSM's belief that the adoption of a "good faith/all permits" standard would cause the least disruption to existing regulatory programs was reasonable.  Id.

Because OSM met its obligations to review the relevant information and articulate a rational explanation for its actions, its decision to adopt the "good faith/all permits" definition of valid existing rights will be accorded deference.

IV.  CONSTITUTIONAL CLAIMS

A.   Takings

NMA argues that the "good faith/all permits" test constitutes a Fifth Amendment taking because it eliminates the right to mine in categories of land covered by § 522(e).  (Pl.'s Mem. Summ. J. at 39-40.)  The Fifth Amendment provides that "[no] private property [shall] be taken for public use, without just compensation."  In VSMRA, the Supreme Court held that the "mere enactment" of SMCRA does not constitute a taking, nor does it, "on its face, deprive owners of land within its reach of economically viable use of their land since it does not proscribe nonmining uses of such land."  452 U.S. at 296 n.37.

NMA has not demonstrated that the new regulation results in an unconstitutional taking.  In addition to those reasons set

- 22 -

forth by the Supreme Court, it is clear that if valid existing rights are denied, compensation is available under the Tucker Act.  See 28 U.S.C. § 1491; see also United States v. Riverside Byview Homes, Inc. 474 U.S. 121, 127-28 (1985) (holding that requiring a person to obtain a permit before engaging in a certain use of his property does not "take" the property, but even if it did, "so long as compensation is available for those whose property is in fact taken, the governmental action is not unconstitutional.")  Because compensation would be available if property is taken, no unconstitutional taking results from the 1999 final rule.

B.   Due Process

NMA also contends that OSM has not provided property rights holders "'a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements'" in violation of the Due Process Clause.  (See Pl.'s Mem. Summ. J. at 44 (quoting United States v. Locke, 471 U.S. 84, 108 (1985).)

In a pre-SMCRA opinion, the Supreme Court held that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations[,] . . . even [if] the effect of the legislation is to impose a new duty or liability based on past acts."  Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16 (1976).  In fact, the SMCRA grew out of

decades of discussions about banning surface coal mining,
including various Congressional bills that were vetoed by
President Ford.  (<u>See</u> Intervenor Defs.' Mot. for Summ. J. at 24-
25.)  In any event, as is noted above, all affected parties had
numerous opportunities to comment on the appropriate standard
during the multiple rulemaking processes.  As such, plaintiff
received all the process it was due.  The promulgation of the
1999 final rule did not violate the Due Process Clause of the
Fifth Amendment to the Constitution.

<u>CONCLUSION</u>

OSM's "good faith/all permits" standard is not inconsistent
with the discernable Congressional intent related to § 522(e) of
the SMCRA.  Moreover, OSM considered the relevant factors and
supplied a rational explanation for its conclusion.  Therefore,
the 1999 final rule is not arbitrary, capricious, inconsistent
with the law or otherwise unreasonable, and is entitled to
deference.  In addition, the 1999 final rule does not constitute
a takings violation, nor does it deprive property rights holders
of due process.  Accordingly, NMA's motion for summary judgment
will be denied and federal defendants' and intervenor defendants'
motion for summary judgment will be granted.  A final Order
accompanies this Memorandum Opinion.

- 24 -

SIGNED this 4th day of May, 2006.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge